**IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| ANTHONY FEACHER | ) | |
| | ) | |
| | ) | |
| | ) | CIVIL ACTION FILE NO.: |
| Plaintiff, | ) | ____________________ |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| TMC TRANPORTATION COMPANY | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Anthony Feacher (the "Plaintiff," "I," "me," or "Mr. Feacher") respectfully submits the following Complaint:

**INTRODUCTION**

At all times relevant to this dispute, Arnett Holding, Inc. (also known as, "TMC Transportation Company" or the "Defendant") provides expert flatbed service coupled with a world-class logistics group to provide solutions throughout the United States of America and Canada.

Plaintiff is a commercial driver who was a commercial driver and drove for the Defendant from December 13, 2019, through December 17, 2020.

## JURISDICTION AND VENUE

1. Plaintiff's claims under the Fourteenth Amendment of the U.S. Constitution, actionable under 42 U.S.C. §1983, present federal questions over which the Court has subject matter jurisdiction under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

2. This court is a proper venue of the Plaintiff's claims under 28 U.S.C. 1391(b), because the Plaintiff resides in the Northern District of Georgia. Furthermore, the unlawful conduct giving rise to these claims occurred while the Plaintiff lived in this District.

## THE PARTIES

3. The Defendant is a trucking company based in Iowa.

4. The Plaintiff is an African American man.

5. The Plaintiff's employment with the Defendant was terminated as of December 17, 2020.

6. He was treated differently and less favorably from similarly situated employees who were not in his protected class.

## FACTUAL ALLEGATIONS

7. Plaintiff checked into a room at the Baymont Inn and Suites in Des Moines, Iowa for a mandatory two-week orientation stay.

8. By the look on his face, he was not pleased to be sharing a room with an African American man.

9. I spoke to him but he did not respond to me.

10. He paced the room for a while before grabbing his bags and went back to the front desk to request a different room.

11. According to the front desk staff, the roommate came to them and requested "another room because he does not share rooms with NIGGERS!"

12. The front desk staff member asked him to go back to his room for the night since they did not have another room available at the moment. The front desk promised they would try and find a different room in the morning. He returned to the room clearly upset because he slammed the door which woke me.

13. I asked him what the problem was and he ranted "the recruiter promised me I wouldn't be around any NIGGERS or have to share a room with any NIGGERS!" and "he was raised not to be around NIGGERS" and "if his father knew he was in the room with a NIGGER, his father would kill him and me as well."

14. I got up and went down to the front desk and complained to the Hotel Manager Linzie.

15. Linzie advised me she would make a formal complaint to TMC corporate office on that Monday morning which was the next day.

16. She further said no rooms were available and that I had to stay in that room for the rest of the night.

17. So, I returned to my assigned room (along with the racist) and stayed awake all night while the roommate paced in the room for the rest of the night.

18. During the orientation, TMC constantly reminded all of the trainees (including me) during the orientation was that we needed to form a great relationship with our trainers because they could make or break our careers.

19. I also asked to speak with a manager at TMC and told him what happened during the previous night.

20. The TMC manager told me "Boy, suck it up or catch the greyhound bus home."

21. Back at the hotel, I spoke to Linzie, the hotel manager again and she gave me another room away from the racist roommate.

22. She also apologized to me for having the unfortunate experience of being discriminated by a fellow TMC employee.

23. A few weeks after I started at TMC, I was required to meet Kenneth Moyer, a trainer with TMC, to learn TMC's ways and manner of driving a truck.

24. As I drove up to Mr. Moyer's house, I called Mr. Moyer (as instructed) to let him know I was driving up to the house.

25. Mr. Moyer invited me to come up to his door.

26. On approaching his front door, I was greeted by Mr. Moyer walking onto his porch with a gun strapped to his waist and questioning vigorously why I was on his porch.

27. Mr. Moyer and I left in Mr. Moyer's truck for a five-week "driving" training period.

28. Mr. Moyer shared how he kept wishing one of "those people" would say the wrong thing to him so he (Mr. Moyer) would inflict some pain on that person.

29. He then showed me an assault knife he hid on himself.

30. He bragged about that assault knife and the damage that he could inflict on another person if the person looked at him (Mr. Moyer) the "wrong" way.

31. For the entire five-week period, Mr. Moyer constantly reminded me that my career at TMC was entirely in his (Mr. Moyer's) hands and that I had better share nothing but good things about the training I was receiving from Mr. Moyer.

32. If I did not, Mr. Moyer threatened me with the loss of my job.

33. For instance, Mr. Moyer demanded that I climb up on top of Mr. Moyer's truck and put on the tarp while the weather was getting worse.

34. When I asked him to help me, he absolutely refused and said, “if you don’t do as I said, I will tell TMC and you will get fired immediately.”

35. I also spent most nights in the truck with Mr. Moyer where I was unable to freely use the bathroom at night because I essentially had to take permission from Mr. Moyer each time I had to get up and step outside the truck.

36. I was dispatched to pick up a load and take it to Virginia.

37. I picked up the load and drove it to Virginia.

38. Once I made sure my load had been delivered to the consignee and the load was unstrapped, I quickly went to use the restroom.

39. On my way back to the truck, I was accosted by three White men wearing overalls with long hair and long beards.

40. They stopped me and asked me “what the fuck are you doing up here on our land?”

41. As these men encircled me and spat tobacco on me, they started to ask me “when did TMC start hiring NIGGERS?” and “TMC knows we don’t like NIGGERS up here.”

42. These three men kept badgering me with “when did TMC start hiring NIGGERS?” and “it’s bad enough TMC has all-Black trucks and now they have a Black NIGGER to drive the truck?”

43. Finally, the truck was unloaded, and I was able to get into my truck and drove to a safe place where I could call Mr. Seydel.

44. Please note I did not have cellphone service or computer service in my truck for any kind of emergency use during my trip through the Appalachian Mountains.

45. Once I got to an area with cellphone service, I immediately called my Fleet Manager, Nicholas Seydel, to (i) report my experiences with the individuals in Virginia.

46. After listening to me recount my experiences, all Mr. Seydel could do was to laugh at me and said "I guess that scared you huh!" and laughed again.

47. I also called the home office and spoke to the Operations Manager, Kyle Miller, and went over everything about my experiences with Mr. Miller as well.

48. Unfortunately, Mr. Miller had the same reply as Mr. Seydel – he laughed at me.

49. Mr. Miller answered the phone with Mr. Feacher on speaker phone with his entire team (including Mr. Seydel) listening and laughing at me in the background!

50. I told him I would be out to Iowa within a week to further discuss this issue face-to-face but everyone on the call (Mr. Miller, Mr. Seydel, and the other

employees on the call) continued to laugh. Before the week was out, I went to Iowa to address the issue with this dispatch including the discrimination I faced.

51. I also made certain to request again, that I never be sent to that location again.

52. I was again dispatched to pick up a load to take to Virginia once more(the same location where I had the "welcome wagon" of racist men who threatened me).

53. I was so upset, angry, hurt, and most of all, I was scared for my life so I made certain the load was unstrapped and unloaded as quickly as possible. I then drove my truck until I got to a safe haven where I had phone service.

54. Again, there was NO phone or internet access at that location so I was not able to call Mr. Seydel or speak to him to receive any calls or to get or receive any support or any kind.

55. Once I had cellphone services, I called Mr. Seydel to let him know I did not appreciate being dispatched to the same location where I had a negative and life-threatening incident with the three racist men.

56. Mr. Seydel's response was to let out a long chuckle and then respond with "I guess you turned from black to white!"

57. A few days later, I returned to Iowa to file yet another complaint that was never addressed.

58. In the wake of the death of George Floyd, the Black Lives Matter protests were taking place across the country during the summer of 2020.

59. Mr. Seydel dispatched me to pick up and then deliver a load to TMC's number one client, Home Depot.

60. After picking up the load and headed to Home Depot, I realized I would be delayed by the Black Lives Matter protests on the freeway, so I called Mr. Seydel and asked him to call Home Depot and alert them to my possible delay (by 5-10 minutes).

61. Mr. Seydel's response was as follows: "what is this? This is so overrated!"

62. I replied, "what do you mean?" Mr. Seydel responded, "all of this Black Lives Matter protest bullshit."

63. Plaintiff continued "you think it was okay for that cop to kill George Floyd with his knee on his neck?"

64. He responded, "I don't think he killed him, I believe he's innocent."

65. He said further that "me and my family used to wrestle all the time and I would have used the same move."

66. I then said, "you would kill someone for no reason by putting your knee on someone's neck?"

67. And Mr. Seydel responded, "he didn't kill him and you people are all alike over-exaggerating over this Black Lives Matter bullshit."

68. I finally said, "Wow, you're using the term "you people" which means "nigger."

69. Mr. Seydel ended the conversation with "whatever" and hung up the telephone.

70. Subsequently, I made a complaint to TMC concerning this trip to Home Depot, which I never heard back from anyone at TMC.

71. I developed chest pains, constant vomiting, an inability to sleep, burning in my stomach and my chest; developed shortness of breath, and was mentally and emotionally drained.

72. I finally went to the emergency room and was told that I probably has acid reflex/GERD.

73. I was given medication, told I needed to see a gastroenterologist, and then discharged.

74. My symptoms continued to get worse so I made an appointment to see a doctor.

75. On December 4, 2020, I informed Mr. Seydel that I had a doctor's appointment for December 14, 2020, to address the burning in my chest and constant vomiting (amongst other symptoms).

76. Mr. Seydel flat-out said No.

77. I reiterated that I had to go for the appointment on December 14, 2020, to check out the burning in my chest and constant vomiting (and my other symptoms).

78. So, I went to see Dr. Jyotsna Talapaneni as scheduled.

79. After seeing her, she advised me I needed an emergency endoscopy (Upper GI) on the following day, December 15, 2020, at 1:30pm, where I was placed under anesthesia in order to have the endoscopy.

80. I then called Mr. Seydel immediately after and explained that the doctor advised that I was scheduled to have an emergency endoscopy the next day. Mr. Seydel told me to postpone the procedure and I refused.

81. I had my endoscopy as scheduled for December 15, 2020.

82. I spoke with my doctor, Dr. Talapaneni, and she explained that I had peptic ulcers and hiatal hernia.

83. I was scheduled to return to the doctor's office in 6-8 weeks for another endoscopy to see my progress.

84. Dr Talapaneni also prescribed medication for me.

85. I then asked if I could return to work. She advised me not to drive at all for the rest of the day on December 15th. She also advised that if I felt up to it, I could start driving on December 16, 2020.

86. I called Mr. Seydel and informed him of the developments following his visit to the hospital.

87. I specifically informed Mr. Seydel I was put under anesthesia to have the endoscopy and that I received two prescriptions that I had to start immediately.

88. I also informed Mr. Seydel I was cleared for driving starting December 16, 2020.

89. Mr. Seydel said I could not drive until I was cleared by TMC's medical department.

90. He transferred me to the medical department and spoke with Michelle. After relaying the information from my doctor (including (i) the fact that I was placed under anesthesia before I had the endoscopy; and (ii) I received two prescriptions which I was required to begin immediately after the procedure), Michelle asked me for the names of the two prescriptions, which I provided. She checked something and then she quickly approved me returning to work on December 16, 2020.

91. I called Mr. Seydel back and reported on what Michelle said.

92. So, Mr. Seydel informed me there was a load that needed to be in Tampa as soon as possible.

93. I decided to would use that opportunity to get my truck serviced while in Tampa.

94. On December 16, 2020, I picked up the load and drove my truck to Tampa and arrived on December 17 by 10:00 am.

95. Soon after arriving, I received a message from Mr. Seydel asking me to call him back immediately.

96. Upon calling Mr. Seydel back, I was informed of my impending "random drug test."

97. I asked Mr. Seydel to confirm he was asking me to take a drug test less than 24 - 48 hours after being under anesthesia.

98. Mr. Seydel stated that if I did not take the drug test as scheduled, I would be fired on the spot.

99. So, to make sure Mr. Seydel understood what he was asking me to do, I asked Mr. Seydel again what he was asking me to do.

100. I further explained I was not comfortable with taking a drug test so soon after my procedure.

101. Mr. Seydel said again that if I did not take the drug test that day, I would be fired immediately.

102. When I protested some more, Mr. Seydel told me I was fired.

103. I then told Mr. Seydel he must think that "all black people were dumb."

104. Mr. Seydel then decided the best way to resolve the situation was to slander, humiliate, and harass me further which caused me additional mental and physical stress.

105. For some reason, Mr. Seydel then spent the rest of the day calling me and leaving messages to say he "fucked up."

106. I also received calls from Mr. Miller, the TMC's Operations Manager, and Todd Bunting, TMC's Vice President of Safety, but I did not speak to them.

107. My cellphone continued to ring off the hook so Mr. Feacher answered, and it was Mr. Seydel calling to "apologize."

108. But Mr. Seydel then said Messrs. Miller and Bunting were going to re-schedule the drug test for another day.

109. Messrs. Miller and Bunting then joined the phone call and Mr. Bunting stated with "so, you're refusing to take the drug test" after which I told him to "have a great day" and hung up the phone.

**Punitive Damages Allegations**

110. Defendant undertook all of the above-pled unlawful conduct intentionally, willfully, and maliciously with respect to the Plaintiff and his federally protected rights.

111. Additionally, and in the alternative, the Defendant undertook all of the above-pled conduct with reckless disregard for the Plaintiff and his federally protected rights.

**COUNT I**
**Race Discrimination**
**(42 U.S.C. § 1983 against Defendant)**

112. Plaintiff incorporates each of the above factual allegations as if restated here.

113. The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States of America entitles the Plaintiff to equal protection under the laws regardless of her race.

114. Defendant violated the Plaintiff's rights to equal protection by, among other things subjecting her to a racially discriminating environment.

115. Furthermore, Defendant violated the Plaintiff's equal protection rights by failing to take any preventative and/or corrective measures with respect to the discriminatory behavior.

116. As a direct and proximate result of all of the Defendant's actions, the Plaintiff suffered damages including emotional distress, inconvenience, loss of income and benefits, and other indignities.

**COUNT II**

**Punitive Damages O.C.G.A. § 51-12-5.1**

**(Against the Defendant)**

117. Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

118. The Defendant's above-pled actions were willful, malicious, and oppressive within the meaning of O.C.G.A. § 51-12-5.1(b).

119. Additionally, and in the alternative, Defendant's actions display within the meaning of that statute, an entire want of care indicative of a conscious indifference to its actions' consequences.

**COUNT III**

**Attorneys' Fees and Expenses of Litigation**

**O.C.G.A. § 13-6-11 (Against the Defendant)**

120. The Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

121. The Defendant acted in bad faith, have been stubbornly litigious, and/or caused the Plaintiff unnecessary trouble and expense in litigating this case, and the Plaintiff is thus entitled to recover the expenses of this litigation, including attorneys' fees under Georgia law, including but not limited to O.C.G.A. § 13-6-11.

**PRAYER FOR RELIEF**

The Plaintiff respectfully requests the following relief:

a. A declaratory judgement that the Defendant violated the Plaintiff's rights under Title VII of the Civil Rights Act of 1964 and under the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States of America;

b. An injunction prohibiting the Defendant from engaging in such unlawful conduct in the future;

c. Compensatory damages, in an amount to be determined by the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

d. Punitive damages against the Defendant, in an amount to be determined by the jury to be sufficient to punish the Defendant for its conduct towards the Plaintiff and deter it from similar conduct in the future;

e. Reasonable attorneys' fees and costs; and

f. Other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this Ninth Day of February 2022.

**SMITHERS + UME-NWAGBO, LLC**

/s/Nwabundo Ume-Nwagbo
Nwabundo E. Ume-Nwagbo
Georgia Bar No. 721655
Telephone: 404-418-8492 x103

Email: neu@stulawgroup.com

2451 Cumberland Parkway, SE
Suite 3836
Atlanta, GA 30339
Facsimile: 404-736-6063

Attorney for the Plaintiff

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY that I have on this date, February 9th, 2022, served a copy of the foregoing Complaint as COUNSEL OF RECORD FOR PLAINTIFF**, upon all parties counsel of record by depositing a true and correct copy of same to the United States mail, with adequate postage thereon, and/or by statutory electronic service and addressed as follows:

____________________
**Counsel**
**TMC Transportation, Inc.**
_________________________
**Des Moines, Iowa _________**

Respectfully submitted dated Ninth Day of February, 2022.

**SMITHERS + UME-NWAGBO, LLC**

/s/Nwabundo Ume-Nwagbo
Nwabundo E. Ume-Nwagbo
Georgia Bar No. 721655
Telephone: 404-418-8492 x103
Email: neu@stulawgroup.com

2451 Cumberland Parkway, SE
Suite 3836
Atlanta, GA 30339
Facsimile: 404-736-6063

Attorney for the Plaintiff